Filed 1/17/23  P. v. Davis CA4/2
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074748 |
| v. | (Super.Ct.No. ICR22535) |
| JIM DALE DAVIS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John D. Molloy, Judge.  Reversed.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland and Julie L. Garland, Assistant Attorneys

1

General, Eric A. Swenson, Alan L Amann, Felicity Senoski, Kristine A. Gutierrez and Jennifer B. Troung, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

In 1996, a jury convicted Jim Dale Davis, the petitioner herein, along with Theodis Nathaniel Brown and Jerome Pellum Holland of three counts of first degree murder (Pen. Code, § 187),[1] during which a principal was armed with a handgun (§ 12022, subd. (a)(1)) and all of which occurred during a robbery and burglary (§ 190.2, subd. (a)(17)). The jury further found true the multiple murder special circumstance as to each defendant. (§ 190.2, subd. (a)(3).) Each was sentenced to four concurrent terms of life without the possibility of parole, plus one year.

In 2019, following the passage of Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) and the enactment of section 1170.95, defendant petitioned for resentencing. The trial court denied the petition on the ground that defendant's jury was instructed pursuant to former CALJIC Instruction No. 8.80.1, that it could not make findings on the special circumstance allegation without first finding that defendant was a major participant and that he acted with reckless disregard, such that even following the amendments to sections 188 and 189, the convictions were valid. Defendant appealed.

On appeal, we affirmed the order denying the petition, and, upon defendant's petition for review, the Supreme Court granted review pending its decision in the then pending case of *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*). After deciding the

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

2

*Strong* case, the Supreme Court retransferred the case to us with directions to vacate our opinion and reconsider it in light of its decision. We now reverse.

The facts are taken (with editing of some facts relating to the codefendants for brevity and additional procedural history as needed) from the record and decision in Davis's direct appeal, *People v. Brown et al.,* (Oct. 6, 1998, E018586) [nonpub. opn.]. Defendant requested that we augment the record with the jury instructions given in the trial, which were part of the record on appeal and we granted it.

*Events Leading Up to the Murders*

In March 1993, petitioner Jim Davis lived with his wife, two children, and Charity Zimmerle. He was selling methamphetamine from March through May of 1993 with Zimmerle's assistance.

Victim Robert Hogue was also selling methamphetamine in April of 1993. Davis bought methamphetamine from Hogue a couple of times in the beginning of April, but stopped doing business with him because he did not like Hogue's dope. Hogue lived in an upstairs apartment at the One Quail Place complex in Palm Desert. It was about 11 miles from Davis's house.

Approximately two weeks before the killings, Hogue refused to "front" Davis methamphetamine because Davis did not have any money. This upset Davis. Also, a few weeks before the killings, Davis told Zimmerle he wanted to kill victim Jerry Burris. Sometime after this, but before the killings, Davis told Zimmerle they would invite Burris

3

to dinner and kill him because Burris knew too much. Zimmerle thought Davis was joking about killing Burris on both occasions.

About April 17, 1993, Theodis Brown, Orlando "Bone" Watley, and Kerry "K.J." Parker[2] discussed a robbery plan with an individual named Damion Johnson in Johnson's bedroom at his group home. Brown said they planned to rob a White male who had a substantial amount of drugs, money and firearms and that he, Brown, could start a little business with the proceeds from the robbery. Watley indicated the man lived upstairs somewhere in Palm Springs or Palm Desert. Brown told Johnson that they needed a fourth person for the robbery and asked him to be that person. Because Johnson had been placed in juvenile hall for selling drugs in the past, he declined to take part in the robbery. Brown, Watley and Parker were wearing long black trench coats during this discussion. At one point, Brown and Watley showed Johnson the black ski masks they planned to use in the robbery. Johnson's foster mother walked into the room during this. When she did so, Brown and Watley attempted to hide or stow the masks. At this point, Watley had no injuries.

A few days later, Brown and Johnson continued the discussion of the robbery at Indio High School, where Johnson was a student and Brown was a part-time security guard. Brown repeatedly tried to convince Johnson to help with the robbery. Brown explained he planned to have two people go inside and gather the money, drugs and guns

---

[2] Parker was defendant Brown's step-sibling's cousin, and had lived with Brown's family before the crimes. Parker's direct appeal was decided under a different case number, *People v. Parker,* E021559 [opn. following retransfer from the California. Supreme Court, filed February 19, 2002].

while two others held whoever was in the apartment at gunpoint on their knees. Parker joined the discussion at one point.

On April 19, 1993, Kandi Croudy told Davis that victim Jeremy Burris had threatened her life during an earlier conversation about some property Burris had stolen from her friends. Croudy had known Davis for about six or eight months at this time. She was laughing about Burris's threat when she told Davis about it. Davis assured Croudy that, "he would be taken care of," or "he would take care of it." He told her, "You don't have to worry about a small little shit like that. It's going to be taken care of in a couple of days." Davis had already helped retrieve some of the property Burris had stolen. Burris had also robbed Davis and was not allowed around his house.

A couple of days before the killings, Burris told Davis, "Give me a line or I'm going to nark on you." Davis did not appear to regard this as a joke.

*The Burglary, Robbery and Killings*

On the afternoon of April 21, 1993, a 5-foot 10-inch, 200-pound African-American man parked Holland's truck across the street from Davis's house and walked over to Davis's driveway. That evening, victim Burris, along with Watley, Parker, Holland and Davis, was at Davis's house. Around 9:00 p.m. Davis met with Brown for a few minutes by the gate outside Davis's home. By midnight, neither Watley, Parker, Burris nor Holland were at the home. Davis was not in his bedroom at this time, and although Zimmerle thought Davis was home, she did not know where he was. Watley's

5

medical card, and Parker's and Watley's black sock hats were in Davis's bedroom. They had never left things like this in Davis's bedroom before.

Meanwhile, four teenagers, including Burris's brother, were visiting victims Hogue and Valerie Arnold at Hogue's apartment. During their visit, the group ingested methamphetamine which Hogue retrieved from a three-inch by five-inch brown wooden box on the living room table. It was this box of drugs which the prosecution alleged later became the object of the robbery and burglary. The group also smoked some marijuana. The four teenagers left on bicycles about 12:30 the next morning. Victim Burris had not been present during their visit.

About 1:30 a.m., the woman who lived across the hall from Hogue heard what sounded like six gunshots, followed by an unfamiliar male voice saying, "No." The neighbor did not call 9-1-1 because she was not sure if the sounds she heard were gunshots.

A woman and a man were at the bottom of the stairs by Hogue's apartment when the shots were fired. The man recalled that he heard about three or four gunshots. About a minute later, the couple saw what appeared to be two men dressed in dark jackets with bandannas on their heads and faces run past them. The couple could not see what race the men were. One of the men appeared to be carrying a foot-long object under his jacket. The two men ran to the parking lot and dove into the back of a slow-moving small gray Mazda pickup truck, which looked similar to the one Holland owned.

6

A security guard for the apartment complex saw a silver truck which looked similar to Holland's driving through the complex with its headlights turned off at this time. It had Nevada plates that began with 85Z or B5Z. The truck exited the parking lot and stopped at an intersection. The guard saw the arm of an African-American man slap the back window of the truck and he heard him yell, "go." The driver, a light complected African-American male, then ran a red light, turned on the headlights and turned left on Highway 111.

About 3:55 a.m. that day, Croudy arrived at Hogue's apartment. Hogue's front door was open about eight inches, the television was blaring and the lights were on. She called Hogue's name; nobody responded. She looked inside the open door and saw a body propped up against the couch and someone's legs on the floor. Croudy opened the door a little farther, looked inside the apartment and realized the people inside were hurt or dead. Croudy went to Hogue's neighbor's apartment and called 9-1-1. She also called Davis's house, and a couple of other people and told them what she had seen. Croudy also called victim Burris's mother, looking for him. She had not recognized Burris's body in Hogue's apartment. Burris's mother had called Davis's house around 3:00 a.m., looking for her son.

Riverside County Sheriff's Department deputies arrived at Hogue's apartment at 4:10 a.m. They found victim Burris lying with his back against the couch, victim Arnold slumped against a love seat and victim Hogue lying in the living room with his head in the hallway. The apartment did not appear to have been ransacked.

7

A Riverside County Sheriff's Department sergeant arrived at Hogue's apartment about 5:30 a.m. He found no signs of a forced entry or disturbances in the bedroom or living room. He found a black box with a microphone inside of it on the coffee table; he did not find the brown wooden box there or anywhere in the apartment. He found the following items in Hogue's bedroom: methamphetamine in a fanny pack; two baggies of marijuana; a peanut butter jar which contained marijuana; smoking paraphernalia; a triple beam scale; a funnel; a "pay-owe" book; baggies and a total of $3,000 in the pockets of several garments which were hanging in the closet. He found $200 in Hogue's right front pocket and a quarter gram of rock-like methamphetamine in a fanny pack on Burris. He did not find any firearms in the apartment. He opined methamphetamine and marijuana had been sold or were being sold from Hogue's apartment based on the items found.

Also around 4:00 or 5:00 a.m. on April 22, 1993, Watley and Parker arrived at Lisa Smalling's house in Indio. Smalling sold methamphetamine for Brown during the months of April and May of 1993. Watley and Parker were dressed in long black coats and khaki pants and Watley was wearing gloves and a black knit beanie. Brown arrived at Smalling's house about an hour later. He was not wearing a jacket. Brown looked tired, but not sick. The four of them conversed and at one point Watley said, "I did it," "I killed them," and "I killed the bitch." Although Watley did not say who "the bitch" was, he had referred to victim Arnold earlier that month as "the bitch." Smalling recalled that Brown had told her that Watley did not like Arnold and Arnold occasionally stayed at the

8

One Quail Place apartments. Smalling said that Watley had a fresh cut on his hand that morning, as well as dried blood near the cut.

Meanwhile, about 4:00 or 4:30 a.m. on the day of the killings, defendant Davis went to his neighbor's house to make a telephone call, even though the phone in his own home was working. Davis made a couple of calls, conversed with the neighbor and then told him, "Well, if anybody asked [*sic*] you I was home." The neighbor recalled Davis was sweating, which was unusual at that time of the morning. Davis also seemed nervous, but this was not unusual for him. Davis stayed at the neighbor's house for about 15 to 20 minutes and returned at around 6:00 a.m. to use the phone again. Davis again told the neighbor, "If anybody asked [*sic*] you, I was home."

About 6:00 a.m. that day, Davis woke Zimmerle and told her that Hogue had been shot. Holland was present when Davis made this statement, having returned to Davis's by 6:00 a.m. that morning. Holland was also at Davis's residence around noon that day. Around 11:00 a.m., one of Davis's acquaintances, Linda Earlywine, arrived at his home. A stressed and tired Davis told her that his friend had been murdered the night before and that he had been awake all night. Davis did not appear to be grieving. David told Earlywine, "It shouldn't have went [*sic*] that way." Earlywine asked Davis what he meant and he said, "last night just didn't go the way it was supposed to." Davis also told Earlywine he had been at home all night and reminded her that she had seen him both the previous night and that morning. Earlywine noticed the phone at the Davis house was

9

ringing off the hook that morning during the three to four hours she was there. Before the killings, Davis had told Earlywine that he had been to the One Quail Place apartment.

On April 24, 1993, Watley, Parker and Brown went to a party at Johnson's group home. Johnson's foster mother bandaged a sizable cut on Watley's left hand which appeared to be getting red, ostensibly from infection. She asked Watley how he cut himself. Brown answered that Watley was just messing around and got cut. Watley also had quite a few other cuts on his hand.

On July 5, 1993, Autry Johnson had a conversation with Watley and Brown, during which Watley discussed the incident at One Quail Place where he killed three people.

The Riverside County Sheriff's Department sergeant interviewed Davis on two occasions. On May 3, 1993, Davis told the sergeant that victim Burris had been to his house on the evening of April 21, 1993 and left by midnight. Davis said Burris's mother called him around 2:00 a.m. on April 22, 1993, and asked him if he had seen her children. She called him a second time and told him about the killings. Davis said he had no idea who committed them. Davis also told the sergeant he did not know "K. J." but thought he had heard of a "K." On May 20, 1993, Davis admitted he knew K. J. Parker. He told this sergeant that he had denied knowing him earlier because he thought the officer was investigating an alleged fight between Parker and a neighbor.

Sometime after the killings, Davis told Zimmerle that the police were watching and he was going to go to Canada if anything happened. In June of 1993, Davis told one

of the teenagers, who had been at Hogue's apartment shortly before the crimes, "Motherfuckers are talking shit again. Time to take three more motherfuckers out of this valley." When she asked Davis what he was talking about, he said, "You know me."

A forensic pathologist performed the autopsies on all three victims. Arnold had two fatal gunshot wounds to the head. Burris had at least three penetrating incised wounds on the front of his neck, which the pathologist indicated were some of the deepest he had seen. The soft tissue structures between Burris's skin and spine, including his trachea, esophagus, left carotid artery and left jugular vein, were completely severed and his spine had a crease on it from the sharp edge of a knife. Burris also had two gunshot wounds to his head. The two rapidly fatal wounds which severed Burris's trachea appeared to have preceded the rapidly fatal and non-fatal gunshot wounds to his head by "[l]ess than ten [minutes] probably. Ten or so." Hogue had a fatal gunshot wound to his head and a single stab wound to the back of his abdomen which was potentially fatal. All three victims tested positive for methamphetamine or amphetamine.

The bullets recovered from the victims appeared to have BB's on the end with the exception of one of the bullets recovered from Arnold. The casings, although very damaged, appeared to be .25 caliber and to have been fired from the same firearm.

Defendant was convicted of three counts of first degree murder, along with findings that the murders were committed during the commission of a felony. The jury also found the multiple murder special circumstances true, along with the allegation that a

11

principle was armed with a handgun. He was sentenced to concurrent terms of life without possibility of parole, plus one year for the weapon enhancement.

Defendant appealed, and his convictions were affirmed (save for corrections to the abstract of judgment) on October 6, 1998 in an unpublished opinion. (*People v. Brown et al., supra*, E018586, [nonpub. opn].) In that appeal, defendant argued there was insufficient evidence to support the special circumstances finding because the record did not support a conclusion he was a "major participant" within the meaning of *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*). We disagreed, finding the evidence supported the finding he was an active participant, within the meaning of *Tison*. We also noted that Davis had expressed an intent to kill. The California Supreme Court denied review on January 20, 1999, *People v. Brown et al., supra*, S074595.

In 2019, following the enactment of Senate Bill 1437 and section 1170.95, defendant filed a petition for resentencing. The matter came up for hearing on February 14, 2020, at which time the court dismissed the petition. Defendant appealed that decision and we affirmed that decision. Defendant petitioned for review, and the Supreme Court granted and held the case pending decision in the case of *People v. Strong, supra,* 13 Cal.5th 698. Following the issuance of the *Strong* opinion, the case was retransferred to this court with directions to vacate our opinion and to reconsider the matter in light of the decision in *Strong*. We do so now.

**DISCUSSION**

Under section 1172.6, the trial court must vacate a first-degree murder conviction that was based on a felony-murder theory, unless the petitioner either (1) was the actual killer, (2) had the intent to kill and aided and abetted the commission of first-degree murder, or (3) was a major participant in the underlying felony and acted with reckless indifference to human life. (§ 1172.6, subd. (d)(3), incorporating § 189, subd. (e).)

A felony-murder special circumstance, however, requires that the defendant either (1) was the actual killer, (2) had the intent to kill and aided and abetted the commission of first-degree murder, or (3) was a major participant in the underlying felony and acted with reckless indifference to human life. (§ 190.2, subds. (a)(17), (b)-(d).) Here, defendant was not the actual shooter.

While this appeal was pending, the Supreme Court in *Strong* held that *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) "substantially clarified" the requirements of a felony murder special-circumstance finding. (*Strong*, *supra*, 13 Cal.5th at p. 706.) Therefore, it concluded a felony murder special-circumstance finding made before *Banks* and *Clark* were decided does *not* conclusively establish ineligibility for relief under section 1172.8. (*Strong*, *supra*, at pp. 710-720.)

The People concede that, because the felony-murder special-circumstance finding in appellant's case was made before *Banks* and *Clark*, that finding does not, in and of itself, render him ineligible for resentencing. The People therefore agree that the superior

13

court's order summarily denying appellant's petition for resentencing under Penal Code section 1172.6 should be reversed and the matter remanded for further proceedings.

Because the trial court denied the petition based on the felony-murder special circumstances, it has not yet ruled on whether the petition otherwise stated a prima facie case. Therefore, the trial court's order summarily denying appellant's petition must be reversed and this matter remanded for further proceedings consistent with the holding *Strong*.

## DISPOSITION

The order appealed from is reversed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

McKINSTER
J.

RAPHAEL
J.

14